IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL NO. 3:05CV249-H

| | |
|---|---|
| TAMATHA LYNN INGRAM, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | MEMORANDUM AND ORDER |
| ) | |
| CAROLINAS HEALTHCARE ) | |
| SYSTEM ) | |
| ) | |
| Defendant. ) | |
| ) | |

**THIS MATTER** is before the Court on the "Defendant's Motion for Summary Judgment [with attached exhibits] " (document #22) and "Memorandum in Support..." (document #23), both filed January 16, 2007.

Also on January 16, 2007, and in light of the Plaintiff's pro se status and in accordance with Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), the Court issued an "Order and Notice to Pro Se Plaintiff of Defendant's Motion for Summary Judgment," advising the Plaintiff "of the heavy burden that she carries in responding to the Defendant's Motion for Summary Judgment." Document #24 at 1. Specifically, the Plaintiff was informed that:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party. This language means that if the Plaintiff has any evidence to offer to show that there is a genuine issue for trial, she must now present it to this Court in a form which would otherwise be admissible at trial, i.e., in the form of affidavits or unsworn declarations.

Id. In the same Order, the Court sua sponte extended the Plaintiff's deadline for filing her response

to February 28, 2007,[1] and warned her that "<u>failure to respond may result in the Defendant being granted the relief it seeks by way of summary judgment, that is, the dismissal of the Complaint with prejudice.</u>" Id. at 2 (emphasis in original).[2]

Despite this clear direction and warning, the Plaintiff has not responded to the Defendant's Motion for Summary Judgment, nor has she contacted defense counsel or the Court to request a further of extension of time to do so.

The parties previously having consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c), and this Motion being otherwise ripe for disposition, the Court has carefully considered the arguments, the record, and the applicable authority, and will <u>grant</u> the Defendant's Motion for Summary Judgment.

## I. PROCEDURAL AND FACTUAL BACKGROUND

On May 31, 2005, the Plaintiff, Tamatha Lynn Ingram, filed her pro se Complaint, seeking damages and equitable relief for alleged violations of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e ("Title VII") by her former employer, Carolinas Healthcare System, which is operated by Charlotte-Mecklenburg Hospital Authority, a North Carolina hospital authority organized under state law with its primary place of business in Charlotte, Mecklenburg County, North Carolina.

---

[1] Pursuant to Local Rule 7.1(B), the Plaintiff's response otherwise would have been due no later than February 2, 2007.

[2] The record reflects that on January 16, 2007, a paper copy of the "Order and Notice" was mailed to the pro se Plaintiff at her home address.

Using a form book Complaint, the Plaintiff pled generalized claims for disparate treatment based on her race, African-American, and retaliation, including termination, for having filed an administrative charge with the Equal Employment Opportunity Commission ("EEOC").

As noted above, the Plaintiff has not submitted any evidence in support of her claims or in response to the Defendant's Motion for Summary Judgment. Moreover, the Defendant has submitted evidence – most significantly of which are excerpts from the Plaintiff's deposition – which, even taken in the light most favorable to the Plaintiff, demonstrates that there is no triable issue of material fact sufficient for the Plaintiff to avoid summary judgment.

The Plaintiff testified that she was hired by the Defendant sometime in 1994 as an "accounting technician I." In that capacity, she handled client billing and ensured "proper procedures concerning financial services" and was trained in the Defendant's procedures for cash collections.

The Plaintiff admitted in her deposition that while she was employed as an accounting technician I, she received a verbal reprimand for excessive tardiness.

Sometime in 1998, the Plaintiff applied for and received a promotion to a position as a patient registration supervisor. In this new position, the Plaintiff was responsible for the cashiers and received additional training, including specific additional training in cash management procedures.

The Plaintiff admitted in her deposition that sometime after she was promoted to supervisor, one of her subordinates filed two complaints about her behavior. Although the Plaintiff testified that she "c[ould] not recall" any additional details about either incident, the Defendant's records

show that on March 31, 1999, Plaintiff's supervisor, Katie Davis, issued the Plaintiff a written reprimand for altering employee attendance records and counseled the Plaintiff to treat all subordinates equally.

Sometime in 2002, the Plaintiff was transferred to the patient registration manager position at the Defendant's Randolph Road facility where she was responsible for the daily operations of the patient registration department. According to the Plaintiff, she had "personal problems" with four of her subordinates, two of whom were terminated. Contrary to the problems the Plaintiff continued to experience with her subordinates, she testified that her relationship with Ms. Davis, who continued to be Plaintiff's supervisor, was "professional" and "supportive" for nearly two years after the Plaintiff's move to the Randolph Road facility.

The Defendant's records show, however, that beginning in early 2004, the Defendant's Human Resources Department ("HR") and Ms. Davis continued to receive complaints about Plaintiff's performance, including her treatment of subordinates and patients.

In January 2004, Ms. Davis received a phone call from Tanya Jones, a social worker also working at the Randolph Road facility, who informed Ms. Davis that she had witnessed the Plaintiff leaving for shopping trips during work hours and verbally abusing other employees. Following the conversation, Ms. Jones faxed Ms. Davis a list of her complaints about Plaintiff's behavior. Although no formal discipline was imposed on this occasion, she admitted in her deposition that she recalled Ms. Davis discussing these complaints with her.

On April 6, 2004, the Defendant's Compliance Line (in effect, a complaint "hotline") received a complaint about the Plaintiff. The anonymous caller, identified as one of Plaintiff's

4

subordinates, complained that Plaintiff intimidated her employees with threats of termination, sent subordinates on her personal errands, went shopping while "on the clock," mocked the way patients looked and smelled, and generally was unable to perform her duties. In response, HR and Ms. Davis conducted an investigation.

The Defendant's records, which the Plaintiff has elected not to dispute or challenge, show that during the course of the investigation, many of the allegations against the Plaintiff were substantiated by her subordinates. Accordingly, the Plaintiff was issued a final warning on May 5, 2004, outlining a number of specific goals for improvement, which Plaintiff was required to meet in order to avoid "further disciplinary action up to and including termination." When asked during her deposition if this final written warning was the result of discrimination, the Plaintiff stated "I don't recall at this time. I can't answer," and went on to admit that she never complained about this final written warning at any time prior to filing her first EEOC charge, discussed below.

On May 6, 2004, another anonymous caller called the Defendant's Compliance Line and stated that the Plaintiff's subordinates had decided to file age discrimination and harassment charges against the Defendant because of treatment they had received from the Plaintiff. The caller specifically identified two of Plaintiff's older employees whom allegedly had been systematically berated by Plaintiff.

In response to this complaint, the Defendant's Vice President of Patient Registration, Chris Johnson, and Ms. Davis conducted a second investigation, during which they found that the subject employees had only heard rumors from others that the Plaintiff had made disparaging remarks about their age. Although Ms. Davis and Mr. Johnson decided not to discipline the Plaintiff based on

5

hearsay, they did find the complaint sufficiently troubling to warrant a meeting with the Plaintiff, and later, with the entire department.

In May and in June 2004, three additional complaints were made to the Compliance Line, and on each occasion, an anonymous caller stated that the Plaintiff's offending conduct was unchanged. However, because no employee publicly came forward and accused the Plaintiff of inappropriate behavior, the Defendant took no action against her at that time.

On August 6, 2004, Ms. Davis met with Plaintiff to perform her annual performance review, in which Ms. Davis noted that the Plaintiff continued to be under a final written warning and that "[the Plaintiff's] behavior during the past year contributed to an unhealthy work environment for herself and the staff." During her deposition, Plaintiff admitted that by that time, the work environment in her department had become "unhealthy."

In September 2004, Plaintiff was placed on a committee to assist integrating a number of the Defendant's medical clinics, and the Defendant's records show that Laura Thomas, Group Vice President, received complaints from four of Plaintiff's supervisors regarding her performance on the task force. Essentially, those complaints centered on Plaintiff's failure to communicate, to follow through on projects, and/or to adhere to company policy.

On October 15, 2004, Plaintiff filed for and was granted leave under the Family Medical Leave Act ("FMLA"), citing depression and stress as the causes of her need to be absent from work.

The Defendant's records also show that shortly after the Plaintiff began her leave of absence, the Defendant's Collections Department received a telephone call from a patient of the Randolph Road facility stating that he had paid his account balance to Plaintiff's department, yet was still

receiving bills. A review of the patient's record showed that he paid his balance in cash on the day before Plaintiff went out on leave, and that the money had been locked in a safe in Plaintiff's department, but had not been credited to the patient's account and was not accounted for in the department's records. Additionally, some of the cash journals from the Plaintiff's department were missing completely.

Upon learning this, Ms. Davis and Mr. Johnson, in conjunction with the Defendant's Security Department, initiated an investigation into the cash management practices of Plaintiff's department. The Plaintiff admitted in her deposition that she talked to department employees while on FMLA leave and that she knew there was an investigation relating to money being "stolen" from the safe.

On November 17, 2004, while she was on FMLA leave, and after she admittedly was aware of the investigation concerning the missing cash, the Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), complaining for the first time about the final written warning. The EEOC did not send a Notice of Charge of Discrimination to the Defendant until November 26, 2004.

On November 19, 2004, the acting manager of the Plaintiff's department was interviewed by an investigator from the Defendant's Security Department and described the Plaintiff's department's accounting procedures as "chaotic." The Defendant's undisputed records show that other employees relayed a number of incidents in which money disappeared from the department and reiterated the earlier complaints about the Plaintiff's abusive treatment of staff.

On November 29, 2004, the Plaintiff returned from FMLA leave and immediately met with Ms. Davis and Ms. Ford, who told her that due to issues raised during the course of the investigation

7

into her department's cash collections, the Plaintiff would be placed on suspension pending the results of the investigation. The next day, Plaintiff filed a second charge of discrimination with the EEOC, alleging that her suspension was in retaliation for filing her first charge of discrimination. The EEOC did not forward this Second Charge to CHS until December 13, 2004.

In the interim, on December 2, 2004, the Plaintiff was interviewed by one of the Defendant's investigators regarding the cash management procedures in her department, and the Plaintiff acknowledged a previous incident involving a missing cash bag.

Following the investigation, the investigator reported to Mr. Johnson that while there was no physical evidence of the Plaintiff's involvement with the missing funds, there were a number of inconsistencies in her testimony.

On December 9, 2004, and in consultation with the HR Department, Mr. Johnson terminated Plaintiff's employment, for the stated reasons of her failure to implement appropriate financial controls, the previous complaints by her employees, and more recent complaints by her fellow managers.

On December 13, 2004, the Plaintiff filed a third administrative charge with the EEOC, alleging retaliation for filing her first two charges.

Sometime thereafter, the EEOC issued the Plaintiff what is commonly called a "right to sue" letter, and the Plaintiff filed this lawsuit on March 31, 2005.

On January 16, 2007, and following the close of a nine-month discovery period, the Defendant filed its "Motion for Summary Judgment" (document #22), which is accompanied by relevant portions of the Plaintiff's deposition transcript and other admissible evidence establishing

the facts stated above. As previously noted, despite having been clearly warned of the consequences of doing so, the Plaintiff has failed to respond in any fashion to the Defendant's Motion, which is now ripe for disposition.

## II. DISCUSSION OF CLAIMS

### A. Standard of Review

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment should be granted when the pleadings, responses to discovery, and the record reveal that "there is no genuine issue as to any material fact and. . . the moving party is entitled to a judgment as a matter of law." See also Charbonnages de France v. Smith, 597 F.2d 406 (4th Cir. 1979). Once the movant has met its burden, the non-moving party must come forward with specific facts demonstrating a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). However, the party opposing summary judgment may not rest upon mere allegations or denials and, in any event, a "mere scintilla of evidence" is insufficient to overcome summary judgment. Id. at 249-50.

When considering summary judgment motions, courts must view the facts and the inferences therefrom in the light most favorable to the party opposing the motion. Id. at 255; Miltier v. Beorn, 896 F.2d 848 (4th Cir. 1990); Cole v. Cole, 633 F.2d 1083 (4th Cir. 1980). Indeed, summary judgment is only proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there [being] no genuine issue for trial." Matsushita Elec. Indus.

Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotations omitted).

### B. Title VII Claim for Disparate Discipline

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. makes it an unlawful employment practice for an employer:

> to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

In order to prove a Title VII claim, an employee may proceed under ordinary principles of proof using direct or indirect evidence, or under the paradigm for indirect proof of employment discrimination set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Evans v. Technologies Applications & Service Co., 80 F.3d 954, 959 (4th Cir. 1996), citing Goldberg v. B. Green & Co., 836 F.2d 845, 848 (4th Cir. 1988).

To overcome a summary judgment motion based upon direct or indirect evidence of discrimination, the plaintiff "must produce direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact." Brinkley v. Harbour Recreation Club, 180 F. 3d 598, 607 (4th Cir. 1999), quoting Goldberg, 836 F.2d at 848. Accord Fuller v. Phipps, 67 F.3d 1137, 1142 (4th Cir. 1995) (to overcome summary judgment, plaintiff must provide "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision").

In this case, the Plaintiff has submitted no evidence, much less direct evidence of racial discrimination in the Defendant's decision to issue her a final written warning.

Under the alternative proof scheme established in McDonnell-Douglas, if the employee establishes a prima facie case of illegal discrimination (as discussed below), the burden shifts to the employer to articulate some legitimate, non-discriminatory reason for its employment decision. 411 U.S. at 802. If the employer does so, the presumption of discrimination "drops from the case," and the employee must demonstrate that the employer's stated reason for its action was, in fact, a pretext for improper discrimination. Id. at 804.

The Supreme Court has made clear that the plaintiff at all times "bears the ultimate burden of proving ... intentional discrimination." Runnebaum v. NationsBank of Maryland, 123 F.3d 156, 164 (4th Cir. 1997) (en banc), citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-11 (1993) (holding that prima facie case plus disbelief of employer's asserted justification is not necessarily sufficient to survive summary judgment). However, in Reeves v. Sanderson Plumbing Prods., Inc., the Supreme Court has held that:

> a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated. This is not to say that such a showing by the plaintiff will always be adequate to sustain a jury's finding of liability.

530 U.S. 133, 147-48 (2000) (emphasis added). Accord Rowe v. Marley Co., 233 F.3d 825, 830 (4th Cir. 2000) ("In Reeves the Supreme Court held that when a plaintiff establishes a prima facie employment discrimination case and that his employer's explanation is pretextual, this does not automatically create a jury question, but it may do so.")

In order to establish a prima facie case of disparate discipline under Title VII, a plaintiff generally must show that (1) she engaged in prohibited conduct similar to that of a person of another

race, and (2) that disciplinary measures enforced against the plaintiff were more severe than those enforced against the other person. See Taylor v. Virginia Union Univ., 193 F.3d 219, 234 (4th Cir. 1999).

Applying these principles to this case, the Plaintiff has clearly failed to establish a prima facie case of disparate discipline. Indeed, the Plaintiff has not identified any alleged comparators, that is, any non-African-American employees who were accused of mistreating coworkers or subordinates on multiple occasions and yet not given a final written warning. Rather, the record is entirely silent as to whether any of the Defendant's other employees was ever disciplined for any behavior, much less for behavior remotely similar to that in which the Defendant concluded the Plaintiff had engaged.

Even assuming arguendo that Plaintiff has made out a prima facie case of discrimination, the Defendant has offered evidence that the Plaintiff was disciplined because a subsequent investigation substantiated allegations (made by Ms. Jones and the first anonymous caller to the Compliance Line) of Plaintiff's poor work performance, including but not limited to abuse of her subordinates. In other words, the Defendant has clearly "articulate[d] some legitimate, non-discriminatory reason for its employment decision." McDonnell-Douglas, 411 U.S. at 802.

Finally, the Plaintiff is clearly unable to establish that the Defendant's stated reason is "merely pretextual" or to carry her "ultimate burden of proving intentional discrimination." Runnebaum, 123 F.3d at 164, citing, St. Mary's Honor Ctr., 509 U.S. at 506-11. As discussed above, when asked during her deposition if the final written warning was the result of racial discrimination, the Plaintiff stated only "I don't recall at this time. I can't answer," and went on to

admit that she never complained about the final written warning at any time prior to filing her first EEOC charge, that is, not until after she learned that the Defendant had begun its investigation into the cash management practices in the Plaintiff's department and her potential responsibility for the missing cash. Her generalized allegations of racism in the issuance of the warning are also belied by the undisputed fact that the same manager who issued the warning (Ms. Davis) also was the decision maker concerning one if not both of the Plaintiff's earlier promotions. Accord Mitchell v. Data Gen. Corp., 12 F.3d 1310, 1318 (4th Cir. 1993) (when same decision maker both hires/promotes and terminates plaintiff, inference of nondiscrimination arises); and Proud v. Stone, 945 F.2d 796, 797-98 (4th Cir. 1991) (same).

In short, because the Plaintiff has failed to raise a material issue of fact as to whether the Defendant's decision to issue a final written warning was based on racial animus, or to produce any substantial evidence that the Defendant's stated reason was "pretextual," the Defendant's Motion for Summary Judgment must and will be granted as to Plaintiff's claim for race-based disparate discipline.

### C. Title VII Retaliation Claim

In addition to prohibiting harassment or discrimination in the workplace on the basis of race, religion, or gender, Title VII of the Civil Rights Act of 1964 prohibits employers from retaliating against employees who attempt to enforce rights under the Act. 42 U.S.C. § 2000e-3(a).[3]

---

[3] Title 42 U.S.C. §2000e-3(a) specifically provides as follows:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management

To establish a prima facie case of retaliation in violation of Title VII, an employee must show that: 1) the employee engaged in protected activity; 2) the employer took adverse employment action against the employee; and 3) a sufficient causal connection existed between the protected activity and the adverse action. McNairn v. Sullivan, 929 F.2d 974, 980 (4th Cir. 1991), citing Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir.1985), abrogated in part on other grounds by Price Waterhouse v. Hopkins, 490 U.S. 228 (1989). See also Hopkins, 77 F.3d at 754; and Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989).

Generally, once a plaintiff has made the required prima facie showing, the burden shifts to the employer to produce a "legitimate nondiscriminatory reason for the adverse action, thereby rebutting the presumption of retaliation raised by the prima facie case." Ross, 759 F.2d at 365, citing Womack v. Munson, 619 F.2d 1292, 1296 (8th Cir. 1980).

If the employer satisfies this burden of production, "the employee bears the ultimate burden of proving retaliation by demonstrating that the employer's proffered reason is pretextual" and that the real motive for the employment action was retaliation. Id., citing Womack, 619 F.2d at 1296. Accord St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-11 (1993).

Essentially, to prove retaliation a plaintiff must establish that the adverse action would not have occurred "but for" the protected activity. Id. at 365-66. "A causal relationship requires more than simple coincidence . . . Causation requires [that] the employer's action be the consequence of

---

committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

14

the protected activities and of nothing else." Bray v. Tenax Corp., 905 F. Supp. 324, 328 (E.D.N.C. 1995).

The Plaintiff is not required to establish the validity of the underlying allegations of a Title VII violation; nonetheless, in order to establish a retaliation claim, "the plaintiff must believe in the validity of the claim, and that belief must be reasonable." Childress v. City of Richmond, 907 F. Supp. 934, 940 (E.D. Va. 1995), aff'd 134 F.3d 1205 (4th Cir. 1998) (*en banc*), cert. denied, 118 S.Ct. 2322 (1998). Accord Mayo v. Kiwest Corp., 898 F. Supp. 335, 337 (E.D.Va. 1995).

It is undisputed that the Plaintiff engaged in a protected activity by filing complaints with the EEOC. See 42 U.S.C.A. § 2000e-3(a) (defining "protected activity" as "participating in an ongoing investigation or proceeding under Title VII, or . . . opposing discriminatory practices in the workplace" and defining "participation" as "(1) making a charge; (2) testifying; (3) assisting; or (4) participating in any manner in an investigation, proceeding, or hearing under Title VII"). Accord Laughlin v. Metropolitan Washington Airports Authority, 149 F.3d 253, 259 (4th Cir. 1998) (same). It is also undisputed that subsequent to the filing of the Plaintiff's first two complaints, the Defendant took an adverse employment action against her when it terminated her employment. The Plaintiff's ability to establish a prima facie case depends, therefore, on whether she can establish a causal link between her protected activities and the termination.

In this case, the Plaintiff's evidence clearly fails to create a genuine issue of material fact as to this final element. At the outset, the undersigned notes that Mr. Johnson, the Defendant's decision maker, terminated the Plaintiff on December 9, 2004, four days before the EEOC notified the Defendant about the Plaintiff's second charge. Accordingly, the Plaintiff can establish a causal

15

connection between her protected activity and her termination only if she can raise an issue of material fact as to a causal link between her termination and her first charge, filed November 17, 2004. However, other than the generalized speculation stated in her Complaint, which is patently insufficient, the Plaintiff has offered no evidence showing a causal connection; rather, the available evidence specifically rebuts the notion that Plaintiff's termination was in retaliation for engaging in protected activity. Prior to the Plaintiff filing her first administrative charge, a number of issues were raised which eventually led to her termination. First, as more fully described above, Plaintiff's treatment of her subordinates prompted four formal complaints, two informal complaints, three investigations and one final written warning. Indeed, even the Plaintiff admitted in sworn testimony that her department had become "unhealthy" due to the friction between her and some of her subordinates.

Second, four other supervisors complained to management regarding Plaintiff's lack of follow through and responsiveness on the task force charged with integrating multiple clinics. These complaints are significant because these supervisor complaints were completely separate and distinct from the complaints levied by Plaintiff's subordinates.

Finally, there were, at a minimum, obvious cash management issues in the department the Plaintiff was charged with managing, prompting an investigation that began <u>before</u> the Plaintiff filed her <u>first</u> charge.

In short, taken in the light most favorable to the Plaintiff, the evidence establishes that the Defendant had a legitimate, non-discriminatory reason for terminating the Plaintiff's employment – namely, for poor work performance related to cash management, mistreatment of subordinates,

and inability to work with her peers (other supervisors). Thus, for the same reasons she cannot establish a prima facie case of retaliation, the Plaintiff cannot carry her ultimate burden of showing that any employment action taken by the Defendant was motivated by an unlawful retaliatory purpose.

For these reasons, the Defendant's Motion for Summary Judgment on the Plaintiff's retaliation claim must and will also be <u>granted</u>.

### III. ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:**

1. The "Defendant's Motion for Summary Judgment" (document #22) is **GRANTED** and the Complaint is hereby **DISMISSED WITH PREJUDICE.**

2. The Clerk is directed to send copies of this Memorandum and Order to counsel for the Defendant <u>and to the pro se Plaintiff, that is, Tamatha Lynn Ingram, 6009 Twickingham Court, Charlotte, North Carolina 28212</u>.

**SO ORDERED, ADJUDGED AND DECREED**.

Signed: March 8, 2007

*Carl Horn, III*

Carl Horn, III
United States Magistrate Judge